**FUJI PHOTO FILM CO. LTD., Plaintiff,**

v.

**JAZZ PHOTO CORP., Jazz Photo Hong Kong Ltd. and Jack Benun, Defendants.**

**No. CIV. 99–2937(FSH).**

United States District Court, D. New Jersey.

Feb. 25, 2003.

Lawrence Rosenthal, Matthew W. Siegal, Lisa A. Jakob, Angie M. Hankins, Stroock & Stroock & Lavan LLP, New York, NY, Robert J. Rohrberger, Fox and Fox LLP, Livingston, NJ, for Plaintiff.

John Crossman, Terence D. Watson, Emma E. Harzem, Dreier & Baritz LLP, New York, NY, Jeffrey I. Kaplan, Kaplan & Gilman, LLP, Woodbridge, NJ, Constance S. Huttner, Meir Y. Blonder, Skadden, ARPS, Slate, Meagher & Flom LLP, New York, NY, Donald P. Jacobs, Budd, Larner, Gross, Picillo, Rosenblaum, Greenberg & Sade, Short Hills, NJ, for Defendants.

## *OPINION*

HOCHBERG, District Judge.

### *BACKGROUND*

This case is the second chapter of a patent infringement dispute involving patents owned by Plaintiff Fuji Photo Film Co. Ltd. ("Fuji") for disposable cameras, known as "lens-fitted film packages" or "LFFPs." Fuji and its licensees manufacture these disposable cameras for sale both in the United States and abroad. Consumers purchase the cameras, take their pictures, and deliver them to photo processors, who then remove the exposed film for development by opening a compartment that holds the film. Once the film is removed, the remaining camera shells are either discarded by the developers, sold back to the original manufacturer, or sold to collectors who then resell them to companies that "refurbish" the cameras by, among other things, reloading the cameras with new film. Defendant Jazz Photo Corp. ("Jazz Photo") and its subsidiary, Jazz Photo Hong Kong Ltd. ("Jazz Hong Kong" and, together with Jazz Photo, "Jazz") acquire these "refurbished" cameras and resell them in the United States.

Jazz was founded in 1995 by Defendant Jack Benun, who was Jazz's President, Chief Executive Officer, and sole Director until 1997, when he resigned his positions with Jazz and assumed the title of "consultant" as part of an effort to take Jazz public (Mr. Benun had previously been barred from serving as an officer or director of any publicly-traded company). Shortly after he founded Jazz, Mr. Benun twice personally approached Fuji for a license to sell its cameras. Fuji refused to grant Jazz a license. Starting in 1995,

Jazz began importing and selling "refurbished" cameras covered by Fuji's patents in the United States. Jazz also imported and sold some newly-made cameras covered by Fuji's patents.[1]

The primary focus of this patent infringement lawsuit involves the manner in which the cameras sold by Jazz are "refurbished."[2] As discussed more extensively below, there is a significant distinction in the law of patents between "repairing" a patented item, such that its useful life is preserved, and "reconstruction" of the item, which is tantamount to making new patented product on the template of the original after its useful life is spent. The former is permissible, as the right of "repair" inheres in the rights of a purchaser under the patent laws. The latter, however, is not, as "reconstruction" of a patented product runs afoul of the patent holder's right to seek and obtain a royalty on patented items newly-made.

1. There is no dispute that Jazz's importation and sale of these newly-made cameras infringed Fuji's patents. The only issues with respect to these cameras are whether the infringement was willful, whether Mr. Benun induced the infringement, and the amount of Fuji's damages.

2. As used in this Opinion, the terms "refurbished" and "refurbishment" are neutral terms, connoting neither "repair" nor "reconstruction." *See Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094, 1094 n. 1 (Fed.Cir.2001) (*"Jazz v. ITC"*).

3. Those patents, with a brief general description of each, are as follows: United States Patent Nos. 4,833,495 (the '495 patent—LFFP having projections for promoting smooth, scratch-free unrolling of film during use); 4,855,774 (the '774 patent—LFFP having a plurality of ribs for promoting smooth, scratch free unrolling of film and other claimed features); Patent 4,884,087 (the '087 patent—LFFP having a spool which promotes film loading and certain assembly features); 4,954,857 (the '857 patent—LFFP having a

Thus, the key issue in the dispute between Fuji and Jazz is whether the cameras sold by Jazz are "refurbished" in such a way that they can be considered to have been permissibly "repaired" or impermissibly "reconstructed."

### Chapter I-The ITC Proceeding.

Fuji began the first chapter of this dispute in 1998 by commencing a proceeding (the "ITC Proceeding") before the International Trade Commission (the "ITC" or the "Commission"). In the ITC Proceeding, Fuji sought to prevent Jazz and the twenty-five other respondents therein from importing refurbished LFFP's into the United States pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Among other things, Fuji claimed that the refurbishment of its patented disposable cameras constituted impermissible "reconstruction," and that the importation of refurbished cameras into the United States therefore infringed fifteen of Fuji's LFFP patents.[3]

roll of unexposed film having no inner spool, film advancement features, and a spool in an LFFP film role to promote film loading); 4,972,649 (the '649 patent—methods of assembling an LFFP with unexposed film removed from a film cartridge and wound in a roll to promote ease of use); 5,235,364 (the '364 patent—LFFP with a flash unit arranged in a specified way to promote compactness); 5,361,111 (the '111 patent—LFFP with a wall to protect flash button to prevent inadvertent flash activation); 5,381,200 (the '200 patent—LFFP with a shutter blade having a crank shape to promote a thinner design); 5,408,288 (the '288 patent—LFFP with a winding knob with knurled teeth to mesh with a film cartridge having knurled teeth); 5,436,685 (the '685 patent—LFFP having a removable mechanical unit to facilitate recycling of spent LFFPs and the remanufacture thereof); Re 34,168 (the Re '168 patent—LFFP in which internal parts project into thickness of front cover); and Design Patent Nos. D 345,750 (the D '750 patent—ornamental features; camera without flash); D 356,-101 (the D '101 patent—ornamental features; camera with flash); and D 372,722 (the

During the course of the ITC Proceeding, only eight of the twenty-six respondents actually appeared before the ITC. Of the remaining respondents, eight failed to respond to the complaint, and ten more failed otherwise to appear. *See Jazz v. ITC,* 264 F.3d at 1098. An ITC Administrative Law Judge held a hearing with the eight participating respondents—including Jazz Photo—after which he issued a detailed Final and Initial Recommended Determination ("IRD") finding that the respondents' activities constituted impermissible reconstruction.

During the administrative hearing, several respondents did not participate in meaningful discovery regarding their refurbishment processes. *Id.* at 1101. Others presented evidence on this issue which the ALJ found to be incomplete or non-credible. *Id.* Thus, at the conclusion of the ITC hearing, the precise details of the accused refurbishing processes were not entirely known. *Id.* Nevertheless, each of the participating respondents in the ITC Proceeding admitted to the use of eight common procedures in their refurbishment processes. *Id.*[4] The ALJ based his finding of impermissible reconstruction on these eight common refurbishment procedures. *See In the matter of Certain Lens–Fitted Film Packages,* Inv. No. 337–TA–406, IRD at 86 (Feb. 24, 1999).

Upon review of the IRD, the Commission adopted the ALJ's finding that the eight common procedures amounted to impermissible reconstruction. *See In the matter of Certain Lens–Fitted Film Pack-ages,* Inv. No. 337–TA–406, n.4 (Int'l Trade Comm. June 28, 1999). The Commission issued a General Exclusion Order and Order to Cease and Desist from further infringement of Fuji's patents.

Jazz and several other respondents appealed the Commission's ruling to the Federal Circuit. On August 21, 2001, the Federal Circuit reversed the Commission's finding of infringement with respect to cameras: (1) refurbished by the eight common procedures which formed the basis of the ALJ's decision, and (2) for which Fuji's patent rights had been "exhausted by first sale in the United States." *Id.* at 1110–11.[5] The Federal Circuit's dual holding in *Jazz v. ITC,* which sets forth both the distinction between "repair" and "reconstruction" and the doctrine of patent exhaustion, is at the heart of the proceedings in this case. A detailed analysis of the Federal Circuit's decision is therefore reserved for later portions of this Opinion.

### Chapter II-The Proceedings Before This Court.

Five days before the Commission issued its opinion in the ITC Proceeding, and prior to Jazz's appeal to the Federal Circuit, Fuji commenced the instant action—the second chapter of its dispute with Jazz—by filing a three-count complaint against Jazz and Mr. Benun seeking damages and injunctive relief for, *inter alia,* direct infringement of Fuji's patents under 35 U.S.C. § 271(a) (as to Jazz) and inducement of infringement under 35 U.S.C. § 271(b) (as to Mr. Benun). The four-year history of this litigation culminated in a

---

D '722 patent—ornamental features; cameras with round shaped flash button area).

**4.** Those eight procedures consisted of: (1) removing the cardboard cover; (2) cutting open the plastic casing; (3) inserting new film and a container to receive the film; (4) replacing the winding wheel for certain cameras; (5) replacing the battery for flash cam-

eras; (6) resetting the counter; (7) resealing the outer case; and (8) adding a new cardboard cover. *Jazz v. ITC,* 264 F.3d at 1098, 1110–11.

**5.** The Court remanded the case to the ITC for any further proceedings in implementing its decision. *Id.* at 1110–11.

five-week jury trial, which is the subject of this Opinion.

*The Parties' Stipulations.* As part of a mutual effort to decrease litigation costs in this case, and to avoid undue delay, the parties entered into a stipulation (the "Repair/Reconstruction Stipulation") prior to the Federal Circuit's decision in *Jazz v. ITC*. Pursuant to this stipulation, the parties agreed to litigate the instant case on the basis of the record in the ITC Proceeding.[6] During the trial of this case, the witnesses' testimony was taken live in order to permit the jury to hear and evaluate the testimony first-hand. As to repair/reconstruction issues, however, the scope of the witnesses' live testimony was limited to the scope of their factual ITC testimony pursuant to the parties' Repair/Reconstruction Stipulation.

Prior to trial, the parties entered into an additional stipulation in which they agreed to submit to the jury a 13–question joint special verdict form (attached as an addendum hereto). The parties stipulated that the Court would: (1) determine whether the factual refurbishment processes found by the jury constituted legally permissible repair or legally impermissible reconstruction; and (2) determine the number of legally infringing cameras and apply that number mathematically to the jury's damages verdict in order to determine the total amount of damages to be awarded.

*The Jury Verdict.* At the conclusion of trial, the jury reached the following verdict:

- Jazz infringed Fuji's patents with respect to 39,889,850 of the 40,099,369 refurbished cameras sold by Jazz from 1995 through August 21, 2001 (*advisory*);

- Jazz infringed Fuji's patents with respect to 1,209,760 newly-made cameras sold during this period;

- Mr. Benun induced Jazz Photo's infringement with respect to 39,103,664 cameras;

- Defendants' sale of newly-made cameras was willful, but their sale of refurbished cameras was not willful;

- A reasonable royalty for Jazz's alleged infringement is 56 cents per infringing camera sold; and

- Fuji lost profits of $3,531,711.70 as a result of Jazz's sales of refurbished cameras and $112,749.63 as a result of Jazz's sales of newly-made cameras.

Pursuant to the parties' stipulation, the Court must now determine the total number of infringing cameras sold by Jazz during the relevant period (1995 through August 21, 2001) and apply that number to the jury's damages per camera verdict to determine the total amount damages to be awarded. Defendants have also moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) challenging the jury's verdict on the issues of lost profits, reasonable royalty, Mr. Benun's inducement, and willful infringement. All issues are decided in this Opinion.

## DISCUSSION

In *Jazz v. ITC*, the Federal Circuit held that the importation or sale of a refurbished camera infringes the patentee's rights unless the alleged infringer can prove as an affirmative defense: (1) that the procedures employed in refurbishing the camera constitute "repair" under the patent laws, rather than impermissible

---

**6.** The Court permitted the parties to reopen discovery on the issue of domestic versus foreign exhaustion after the Federal Circuit's ruling in *Jazz v. ITC*. As to repair/reconstruc-

tion issues, however, the parties' stipulation precluded new discovery beyond the ITC record.

"reconstruction" (*Jazz v. ITC,* 264 F.3d at 1098–99, 1103–1107, 1110–11); and (2) that the camera sold was refurbished from the shell of a camera first sold by the patentee in the United States (*id.* at 1098, 1105, 1110). The first of these requirements is derived from the oft-litigated distinction in the patent laws between permissible repair and impermissible reconstruction. The second requirement arises from the doctrine of patent exhaustion.

It is this Court's task to analyze and apply this two-part test to the facts adduced at trial to determine whether, and to what extent, Jazz's sales of refurbished cameras between 1995 and August 21, 2001 infringed Fuji's patent rights. Part I of this Opinion addresses the doctrine of "repair versus reconstruction" and its application to the facts of this case as found by the jury. Part II, in turn, analyzes the principle of patent exhaustion as articulated by the Federal Circuit in *Jazz v. ITC* and applies this principle to the jury's verdict. Part III sets forth this Court's findings with respect to the number of infringing cameras sold by Jazz pursuant to the parties' stipulation. Part IV decides Defendants' motions for judgment as a matter of law.

## I. REPAIR vs. RECONSTRUCTION

### *"Repair vs. Reconstruction"—Legal Principles.*

The core issues before this Court center around the distinction under the patent laws between permissible "repair" and infringing "reconstruction." This distinction was articulated by the Supreme Court in *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 346, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) ("*Aro I*") as follows: "reconstruction ... is limited to such a true reconstruction of the entity as to in fact make a new article ... after the entity, viewed as a whole, has become spent."

Thus, under the Supreme Court's formulation, reconstruction consists of "*a second creation of the patented entity.*" *Id.* (emphasis added).

While this rule is easily stated, it has proven difficult to implement. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 709 (Fed.Cir.1992). Indeed, the Federal Circuit has repeatedly commented on the challenge faced by the courts in distinguishing between permissible repair and impermissible reconstruction. *See, e.g., Husky Injection Molding Systems Ltd. v. R & D Tool & Engineering Co.,* 291 F.3d 780, 784 (Fed.Cir.2002) ("The Supreme Court and this court have struggled for years" to draw an appropriate line). The critical question is: "how much 'repair' is fair before the device is deemed reconstructed." *Id.*

Cases interpreting the repair/reconstruction dichotomy devolve into three distinct lines. *See Husky,* 291 F.3d at 785. The first line involves situations where a patented item is refurbished in order to make it useable after the item, considered as a whole, has become spent. *Id.* Courts have held that refurbishment of the spent item constitutes impermissible reconstruction. *See, e.g.,*

- *American Cotton–Tie Co. v. Simmons,* 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882) (iron cotton-bale tie consisting of band and buckle; band was cut by original purchaser and defendants thereafter purchased the scrap iron and riveted the pieces of cut band together for use with original buckle—held: reconstruction);

- *Sandvik Aktiebolag v. E.J. Co.,* 121 F.3d 669, 670–71 (Fed.Cir.1997) (breaking off and replacing worn tip of drill bit with tip "recreated" in a process similar to original manufacture

after sharpening was no longer possible—held: reconstruction).

The second line of cases involves the replacement of a spent, unpatented element of a patented combination in order to preserve the useful life of the combination as a whole. *Husky*, 291 F.3d at 785. The leading case in this category is the Supreme Court's decision in *Aro I*, where the Court found replacement of the fabric portion of a patented convertible automobile top to be permissible repair. *Aro I*, 365 U.S. at 346, 81 S.Ct. 599. *See also:*

- *Wilson v. Simpson*, 50 U.S. (9 How.) 109, 13 L.Ed. 66 (1850) (replacement of cutting knives which typically wore out after sixty to ninety days of use—held: repair);

- *Heyer v. Duplicator Mfg. Co.*, 263 U.S. 100, 44 S.Ct. 31, 68 L.Ed. 189 (1923) (replacement of gelatine bands with two-month useful life for use in patented copying machine—held: repair);

- *Everpure, Inc. v. Cuno, Inc.*, 875 F.2d 300 (Fed.Cir.1989) (replacement of cartridge containing spent water filter in water purification unit—held: repair, even where adaptor was necessary to mate replacement cartridge to head of unit);

- *Bottom Line Mgt., Inc. v. Pan Man, Inc.*, 228 F.3d 1352 (Fed.Cir.2000) (refurbishing of plates in hamburger machine, including replacement/rewelding of broken hinge—held: repair).[7]

A final category of cases involves the modification or replacement of a non-patented part in order to enable the patented machine to perform a different function from its intended use. *Husky*, 291 F.3d at 786. Such modification has been held by the following courts to be repair or "kin" to repair. *See, e.g.,*

- *Wilbur–Ellis Co. v. Kuther*, 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964) (modification of fish canning machine to change size of cans used—held: "kin to repair");

- *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp., Inc.*, 123 F.3d 1445 (Fed.Cir.1997) (replacement of cap on ink jet printer cartridge, even if cap was not broken or spent—held: akin to repair);

- *Surfco Hawaii v. Fin Control Sys. Pty., Ltd.*, 264 F.3d 1062 (Fed.Cir. 2001) (sale of replacement fins for surfboard with different characteristics from original, unspent fins—held: repair).

The instant case falls between the first and second lines of cases. In *Husky*, the Federal Circuit established a "safe harbor" to be considered in precisely these situations. 291 F.3d at 787–88. Under the *Husky* analysis, an alleged infringer's refurbishment procedures fall within the *Aro I* line of cases—and, thus, will be considered permissible repair—if the part refurbished by the alleged infringer was "readily replaceable." *Id.* The present case, however, cannot be decided solely on the basis of *Husky's* "readily replaceable" test. Indeed, the *Husky* panel cited to *Jazz v. ITC* as an example of the extreme difficulty faced by courts drawing a line between

---

7. *See also Kendall Co. v. Progressive Med. Tech., Inc.*, 85 F.3d 1570 (Fed.Cir.1996) (replacement of used pressure sleeve in blood pressure device—held: repair); *Sage Products, Inc. v. Devon Indus., Inc.*, 45 F.3d 1575 (Fed.Cir.1995) (replacement of inner container of medical waste disposal unit—held: repair); *Dana Corp. v. American Precision Co.,* 827 F.2d 755 (Fed.Cir.1987) (commercial-scale rebuilding of worn truck clutches—held: repair); *General Electric Co. v. U.S.*, 215 Ct. Cl. 636, 572 F.2d 745 (1978) (assembly-line overhauling of gun mounts including disassembly and replacement of spent parts with new parts or parts from other gun mounts—held: repair).

the first and second lines of cases where the parts at issue are *not* "readily replaceable." *Id.* at 787.

Fortunately, this Court's analysis is aided by the Federal Circuit's determination in *Jazz v. ITC* that the reloading of disposable cameras is more closely analogous to *Aro I*-type cases involving "the replacement of unpatented parts, having a shorter life than is available from the combination as a whole . . . ." *Jazz v. ITC*, 264 F.3d at 1107. Upon "consideration of the remaining useful capacity of the [patented] article, and the nature and role of the replaced parts in achieving that useful capacity," the Federal Circuit concluded, based upon the totality of the circumstances before it, that "the changes made by the remanufacturers [of Fuji-patented cameras] all relate to the replacement of the film." *Id.* Under these circumstances, the Federal Circuit held that the reloaded disposable cameras should "be viewed as repaired, not reconstructed." *Id.* at 1105.

The decision in *Jazz v. ITC* does not, however, conclude the repair/reconstruction analysis for this Court. Because of the unique procedural circumstances involved in that case, where many of the twenty-six respondents had proffered insufficient evidence regarding their refurbishment processes, the ALJ based his decision upon eight common refurbishment processes used by all respondents.[8] The Federal Circuit's holding that reversed the ITC's decision on repair/reconstruction was likewise confined to the eight procedures before it; the Circuit never addressed what impact any additional factual procedures *not* falling within the eight common steps would have on its holding.

Fuji argues that the Federal Circuit's decision in *Jazz v. ITC* forecloses a holding of repair as to any refurbishment procedures beyond the eight common processes endorsed by the Federal Circuit. This Court does not agree. The Federal Circuit could not have reached such a conclusion given the limited record before it, as the ALJ decided the repair/reconstruction issue solely upon the eight common refurbishment procedures admitted to by all respondents. Moreover, Fuji's interpretation of the Federal Circuit's decision contravenes the highly fact-specific nature of the repair/reconstruction inquiry. Both the Federal Circuit and the Supreme Court have repeatedly eschewed reliance on any rigid test in distinguishing between repair and reconstruction, and this Court will not adopt such a test here. *See, e.g., Jazz v. ITC*, 264 F.3d at 1106 (citing *Aro I* ). The repair doctrine does not turn on a consideration of the number of acts performed, or minor details such as what tool was used in the refurbishment process. Rather, the proper focus is on "the remaining useful capacity of the article, and the nature and role of the replaced parts in achieving that useful capacity." *Jazz v. ITC*, 264 F.3d at 1106.

Thus, the task in this case is to determine whether, under the totality of the circumstances, the factual refurbishment process found by the jury to have been used by Jazz and/or its suppliers amounts to such a "true reconstruction" of each refurbished camera as to "in fact make a new article" under established precedent. *See Aro I*, 365 U.S. at 346, 81 S.Ct. 599.

---

**8.** The Federal Circuit summarized these common processes as follows: (1) removing the cardboard cover; (2) cutting open the plastic casing; (3) inserting new film and a container to receive the film; (4) replacing the winding wheel for certain cameras; (5) replacing the battery for flash cameras; (6) resetting the counter; (7) resealing the outer case; and (8) adding a new cardboard cover. *Jazz v. ITC*, 264 F.3d at 1098, 1110–11.

### *"Repair vs. Reconstruction"—Jury Verdict.*

By stipulation of the parties, the jury was asked to state whether or not each of nineteen steps was utilized in the refurbishing of cameras sold by Jazz.[9] When asked: "Which of the following happens at least some of the time when the cameras sold by Jazz are refurbished?," the jury rendered the following verdict:

| Step | Verdict |
| --- | --- |
| (a) Removing the cardboard cover | Yes |
| (b) Cutting open the plastic casing | Yes |
| (c) Inserting new film and a container to receive the film | Yes |
| (d) Replacing the winding wheel for certain cameras | Yes |
| (e) Replacing the battery for flash cameras | Yes |
| (f) Resetting the counter | Yes |
| (g) Resealing the outer case | Yes |
| (h) Adding a new cardboard cover | Yes |
| (I) Removing the front cover | Yes |
| (j) Replacing the front cover from one camera on a different camera | Yes |
| (k) Slim tool step | Yes |
| (*l*) Unwinding the film from the cartridge in the camera | Yes |
| (m) Multiple hook attachments and later removals | Yes |
| (n) Modifying the film cartridge to mesh with the winding wheel | Yes |
| (o) Inserting, then removing a film spindle | Yes |
| (p) Replacing the film door | Yes |
| (q) Cutting plastic tabs to open the camera | Yes |
| (r) Inserting a washer to hold open attached rear cover | Yes |
| (s) Grinding off the Fuji logo | Yes |

Steps (a) through (h) are identical to the eight common refurbishment procedures found to constitute permissible repair by the Federal Circuit in *Jazz v. ITC*. The additional procedures must be analyzed in order to determine whether a refurbishment process involving all nineteen procedures crosses the line from permissible repair to impermissible reconstruction. The parties stipulated that the Court would conduct this analysis, which is an application of law to the facts found by the jury.

### *"Repair vs. Reconstruction"—Application of Law to Fact.*

Procedures (a) through (h) were previously held to be repair. *Jazz v. ITC*, 264 F.3d at 1110–11. These eight procedures essentially permit a camera refurbisher to replace the film and, where necessary, the battery. *See id.* at 1107 ("On the totality of the circumstances, the changes made by the remanufacturers all relate to the replacement of the film, the LFFP otherwise remaining as originally sold"); *id.* at 1111 (permissible repair includes "replacement of the battery in flash cameras"). Permissible replacement of the film and battery cannot be accomplished without:

1. opening the camera (*Jazz v. ITC* procedures (a) and (b));

2. properly inserting the film (*Jazz v. ITC* procedures (c), (d) and (f));

3. replacing the battery for flash cameras (*Jazz v. ITC* procedure (e)); and

4. closing the camera (*Jazz v. ITC* procedures (g) and (h)).

Thus, under the Federal Circuit's formulation in *Jazz v. ITC*, when a camera is opened, film is properly inserted, the battery is replaced, and the camera is closed, the camera has been permissibly repaired.

---

9. The parties jointly stipulated to present the jury with this list of nineteen steps after extensive discussions under the Court's direct supervision. This list was presented by the parties to the Court as the list covering all possible refurbishment procedures which could be identified from the evidence to be presented at trial. This was possible because the parties knew the substantive evidence that would be adduced at trial in advance, given their joint stipulation to limit the evidence on repair/reconstruction to the evidence in the ITC record. After having tried the case based upon this stipulated verdict sheet, Fuji, in its post-trial submissions, now seeks to identify and rely upon additional procedures not covered by the parties' stipulated list. Given that Fuji knowledgeably stipulated to the list to be posed to the jury, Fuji is estopped to now present these additional "steps." Even if considered, however, these additional procedures would have no impact on this Court's holding.

These four permissible processes serve the function of preserving the remaining useful life of the camera as a whole.

As the following table demonstrates, all but one of the nineteen procedures found by the jury to have been actually performed in connection with the cameras sold by Jazz fall within one of these four categories of permissible processes [10]:

| Permissible Action | Equivalent Jury Verdict Procedures |
| --- | --- |
| "Opening the camera" | • removing the cardboard cover (a)<br>• cutting open the plastic casing (b)<br>• removing the front cover (i)<br>• cutting plastic tabs to open the camera (q)<br>• inserting a washer to hold open attached rear cover (r) |
| "Properly inserting the film" | • inserting new film and a container to receive the film (c)<br>• replacing the winding wheel for certain cameras (d)<br>• resetting the counter (f)<br>• slim tool step (k)<br>• unwinding the film from the cartridge in the camera ($l$)<br>• modifying the film cartridge to mesh with the winding wheel (n)<br>• inserting, then removing a film spindle (o) |
| "Replacing the battery" | • replacing the battery for flash cameras (e) |
| "Closing the camera" | • resealing the outer case (g)<br>• adding a new cardboard cover (h)<br>• replacing the front cover from one camera on a different camera (j) [11]<br>• multiple hook attachments and later removals (m) [11]<br>• replacing the film door (p) |

Whether these refurbishment procedures are counted as four, eight or nineteen "steps" is a matter of semantics, as virtually any step can be divided into multiple "sub-steps." The legal issue is whether the totality of the refurbishment

10. The remaining procedure—grinding off Fuji's logo—is of little, if any, significance in considering the repair/reconstruction issue. This procedure is closely akin to the removal the cardboard packaging, which contains Fuji's trademarks, and its replacement with packaging containing Jazz's marks—both of which the Federal Circuit expressly permitted as part of the repair process in *Jazz v. ITC*. This Opinion addresses no trademark issues, nor any consumer protection issues, as these issues have not been put before the Court in this patent trial.

11. Steps (j) and (n), require further comment. Step (j) involves replacement of the front cover of the camera with a cover from an entirely different camera. Such a mixing and matching of unpatented components is permissible under established repair/reconstruction precedent. *Jazz v. ITC*, 264 F.3d at 1103–04 ("Precedent has classified as repair the disassembly and cleaning of patented articles accompanied by replacement of unpatented parts that had become worn or spent, in order to preserve the utility for which the article was originally intended.") (citing *General Electric Co.*, 215 Ct.Cl. 636, 572 F.2d 745 and *Dana Corp.*, 827 F.2d 755). Step (n), modifying the film cartridge to mesh with the winding wheel, is similarly permissible. *See, e.g., Everpure*, 875 F.2d at 303 ("it is of no moment" in contributory infringement suit that manufacturer of replacement water filter cartridge "chose to supply an adapter with its cartridge" to facilitate mating with patented purification unit).

procedures are of such a nature that they preserve the useful life of the patented article, or whether they in fact recreate the article after it has become spent. As set forth in the table above, the procedures found by the jury to have been performed in this case all devolve into opening the cameras, replacing the film and battery, and closing the cameras. The totality of these procedures serve the function of preserving the useful life of the cameras. This Court therefore finds that the refurbishment procedures found by the jury in response to Question 5 of the stipulated Special Verdict form constitute permissible repair.[12]

*"Repair vs. Reconstruction"—Finding As To Number Of Cameras Repaired.*

Question 5 of the stipulated Special Verdict form only called upon the jury to determine whether the nineteen identified processes were performed "at least some of the time" during refurbishment. Under the parties' pre-trial stipulation, the Court is asked to determine, as a matter of fact, the actual *number* of cameras refurbished using some or all of these nineteen procedures. By their stipulation, the parties waived their jury demands as to this issue, which this Court will address as though it had been tried to the bench. Jazz bears

the burden of proof. *See Jazz v. ITC,* 264 F.3d at 1101–02 (infringer has "the burden of establishing [the repair] defense by a preponderance of the evidence, including the burden of coming forward with evidence to show that the activities performed in processing the used cameras constituted permissible repair").[13]

At trial, Jazz adduced the following evidence on repair/reconstruction: (1) a videotape recording taken in the spring of 1998 at the refurbishing facilities of a single Jazz supplier, Boshi (the "Boshi Video"); and (2) the testimony of Mr. Lorenzini, Jazz's current Chairman of the Board of Directors, who was present during the making of the Boshi Video and who also visited two other Jazz suppliers, Peji and Ginfax, in 1997 and 1998.

Mr. Lorenzini testified at length regarding the processes exhibited in the Boshi Video. He also testified regarding the substantial similarity between the Boshi processes and the processes used at Peji and Ginfax during his visits to those factories. Based upon Mr. Lorenzini's testimony, this Court's review of the Boshi Video, and the jury's verdict in response to Question 5, the Court is satisfied that Jazz has met its burden to prove permissible repair

**12.** By contrast to *American Cotton–Tie,* 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882) and other reconstruction precedents, this is not a case where the patented item has been entirely recreated after having suffering "as complete a destruction" as in "the explosion of a patented torpedo." *Morgan Envelope v. Albany Perforated Wrapping Paper Co.,* 152 U.S. 425, 434, 14 S.Ct. 627, 38 L.Ed. 500 (1894) (distinguishing *American Cotton–Tie* ). Rather, whether described in the "nineteen step" verdict, the Federal Circuit's "eight step" holding, or this court's "four step" analysis, it is clear that the totality of the procedures employed by Jazz serve the function of preserving the remaining useful capacity of the cameras through replacement of the film and battery. *See Jazz v. ITC,* 264 F.3d at 1107.

*Cf., Heyer,* 263 U.S. at 101–02, 44 S.Ct. 31 ("The owner when he bought one of these [copying] machines had a right to suppose that he was free to maintain [its] use, without the further consent of the seller, for more than the sixty days in which the present gelatine might be used up. The machine lasts indefinitely, the bands are exhausted after a limited use and manifestly must be replaced."); *Everpure,* 875 F.2d at 302–304 ("Replacement of the spent cartridges" in water filter system "is clearly repair and not reconstruction.").

**13.** *See also* Second Case Management Order dated 10/23/02 at p. 2 n. 1.

with respect to all cameras refurbished by Boshi, Peji and Ginfax.

However, Jazz adduced no evidence whatsoever at trial regarding the refurbishment procedures employed by any other Jazz supplier.[14] Jazz presented no testimony of Mr. Benun on this issue, despite his apparent involvement in the procurement of empty shells. Nor did Jazz call Ms. Szeto, the Managing Director of Jazz Hong Kong, who testified at length in the ITC about the details of processes she had personally seen in visiting four different Jazz suppliers.[15]

■ Jazz chose to rest on the Boshi video and Mr. Lorenzini's testimony. However, Mr. Lorenzini never visited any factory other than Boshi, Peji or Ginfax, and the Boshi video itself says nothing of the processes employed by any other Jazz supplier. Thus, the processes employed in refurbishing the cameras obtained by Jazz from Vastfame, Leader Peak, Mass Chance, Rino and Wingkai are not proven. This Court "cannot exculpate unknown processes from the charge of reconstruction." *Jazz v. ITC*, 264 F.3d at 1109. This is particularly true under the facts of this case, where the jury found that Jazz sold over 1 million cameras that were newly-made by its suppliers. *See Jazz v. ITC*, 264 F.3d at 1109 n. 3. In the absence of any evidence as to the processes employed by suppliers other than Boshi, Peji and

Ginfax, Jazz has failed to satisfy its burden to prove repair with respect to any cameras refurbished by such other suppliers.

Thus, on the evidence adduced by Jazz at trial, only those cameras refurbished by Boshi, Peji and Ginfax are found to have been permissibly repaired. The Court, however, has searched in vain for evidence in the record as to the actual number of cameras sold by Jazz that were produced by these three factories.[16] The only testimony on this issue was that of Mr. Lorenzini, who testified that Boshi supplied Jazz with approximately 10% of its cameras. Accordingly, the evidence of record in this case will support a finding of permissible repair with respect to 10% of the 40,099,369 refurbished cameras sold by Jazz during the relevant period.

### Repair/Reconstruction—Conclusion.

For the foregoing reasons, the Court finds that Jazz has proven that 4,009,937 of the cameras it sold from 1995 to August 21, 2001 were permissibly repaired. The Court further finds that Jazz has failed to satisfy its burden to prove the affirmative defense of permissible repair with respect to the remaining 36,089,432 cameras at issue.[17]

## II. "EXHAUSTION" BY FIRST SALE

This Court's finding of repair with respect to approximately 4 million cameras

---

14. The parties stipulated that Jazz purchased refurbished LFFPs from at least the following eight factories: Boshi, Ginfax, Vastfame, Leader Peak, Mass Chance, Rino, Peji, and Wingkai (while Jazz also purchased refurbished LFFPs from three additional suppliers: Tomda, Southforce and Advance Tech, these suppliers were merely agents who purchased cameras from one or more of the eight named factories).

15. Ms. Szeto's testimony was part of the ITC record, and could therefore have been introduced under the parties' Repair/Reconstruction Stipulation.

16. The Court has twice asked the parties to identify evidence in the record from which the Court could determine the number of cameras refurbished by supplier. No such information has been forthcoming, and Jazz has acknowledged that no separate records were kept of exactly how many cameras were supplied by each factory.

17. The jury was asked to render an advisory verdict on repair/reconstruction, which this Court has considered. The jury found that Jazz proved permissible repair with respect to approximately 5.5% of the cameras refurbished by Jazz.

does not end the inquiry, because a refurbished disposable camera infringes unless it was permissibly repaired from an empty camera shell first sold in the United States. *Jazz v. ITC*, 264 F.3d at 1098–99, 1103–1107, 1110–11. This requirement of domestic first sale derives from the principle of patent "exhaustion."

### *"Exhaustion"—Legal Principles.*

■ The principle of exhaustion holds that a patentee's rights in a patented article are "exhausted" after the first sale of the article by the patentee or under the patentee's authority. *Jazz v. ITC*, 264 F.3d at 1105. In exchange for the royalty received, the patentee ceases to have the ability to use its patent monopoly to restrict the further sale, use, or lawful modification or repair of the product. *See id.; see also, e.g., Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 547, 21 L.Ed. 322 (1872); *Boesch v. Graff*, 133 U.S. 697, 703, 10 S.Ct. 378, 33 L.Ed. 787 (1890) ("when the machine passes to the hands of the purchaser it is no longer within the limits of the monopoly. It passes outside it, and it is no longer under the protection of the act of congress."). This principle flows logically from the common-sense notion that a patentee is "entitled to but one royalty for a patented machine." *Mitchell*, 83 U.S. (16 Wall.) at 547.[18]

■ As the Federal Circuit noted in *Jazz v. ITC*, however, there is a significant exception to this general principle of exhaustion by first sale: A patentee's *United States* patent rights are not exhausted unless the patented product is first sold "under the United States patent." *Jazz v. ITC*, 264 F.3d at 1105. This exception traces its origins to the Supreme Court's decision in *Boesch v. Graff*, in which the Court held that the sale or use in the United States of a patented product purchased abroad, even from an authorized seller of the product in the foreign country, constitutes patent infringement. *See* 133 U.S. at 702–03, 10 S.Ct. 378.

The patentee in *Boesch* owned both United States and German patents for lamp burners. The defendant acquired the burners in Germany from an individual who was not licensed by the patentee to make or sell the product in either country, but was permitted to make or sell the burners under German law. *Id.* at 379–80, 10 S.Ct. 378. The Supreme Court found the defendant's sale of the product in the United States to be infringement. *Id.* at 380, 10 S.Ct. 378.

18. While several decisions of the Federal Circuit, including *Jazz v. ITC*, have addressed the repair/reconstruction question as implicating the doctrine of "exhaustion," (*see, e.g., Jazz v. ITC*, 264 F.3d at 1105; *Surfco Hawaii v. Fin Control Sys. Pty., Ltd.*, 264 F.3d 1062, 1065 (Fed.Cir.2001); *Kendall Co. v. Progressive Med. Tech., Inc.*, 85 F.3d 1570, 1573 (Fed.Cir. 1996)), other Federal Circuit decisions have addressed the issue under the rubric of implied license. *See, e.g., Bottom Line Mgt. Inc. v. Pan Man, Inc.*, 228 F.3d 1352, 1354 (Fed. Cir.2000); *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp., Inc.*, 123 F.3d 1445, 1451 (1997). While these two doctrines are not always congruent, in the instant case they can be viewed as opposite sides of the same coin; *i.e.*, where a patentee's rights are "exhausted" through first sale, subsequent purchasers could be said to have an implied license to repair the purchased article. *See, e.g.*, Michael D. Lake, *Patent & Know–How (Technology) Licensees and Licensing Strategies*, 722 PLI/Pat 353, 371 (Practicing Law Institute, 2002) (exhaustion and implied license rationalized identically). Because the Federal Circuit treated the repair/reconstruction issue as implicating the "exhaustion" doctrine, reserving its discussion of implied license for its analysis of whether subsequent purchasers' rights of repair were limited by the circumstances of sale under principles of contract law (*Jazz v. ITC*, 264 F.3d at 1107–08), this Court similarly treats the repair/reconstruction question as one of "exhaustion," rather than "implied license."

The Supreme Court's decision in *Boesch* left open the question whether a foreign sale by the holder of both United States and foreign patents (or its licensee with a license to sell in both countries) "exhausts" the patentee's rights "under the United States patent." *See* 5 CHISUM ON PATENTS § 16.05[3][a][ii]. Several courts thereafter distinguished *Boesch* on this ground, concluding that, on the one hand, the foreign sale of a patented article by the patentee (or a licensee) constituted exhaustion, while on the other hand the patentee retained its monopoly over items sold abroad by a licensee with no authority to sell the product in the United States. *See Dickerson v. Matheson,* 57 F. 524 (2d Cir.1893); *Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.,* 266 F. 71, 78 (2d Cir.1920); *Sanofi, SA v. MedTech Veterinarian Products, Inc.,* 565 F.Supp. 931 (D.N.J.1983). *See also Dickerson v. Tinling,* 84 F. 192 (8th Cir.1897) (dictum); *Kabushiki Kaisha Hattori Seiko v. Refac Tech. Devel. Corp.,* 690 F.Supp. 1339, 1342 (S.D.N.Y.1988) (dictum); *PCI Parfums Et Cosmetiques Int'l v. Perfumania Inc.,* No. 93 Civ. 9009 (KMW), 35 U.S.P.Q.2d 1159, 1160, 1995 WL 121298, at *1 (S.D.N.Y. Mar.21, 1995).

Prior to its decision in *Jazz v. ITC,* the Federal Circuit was never called upon to address this distinction.[19] The record on appeal in *Jazz v. ITC,* however, placed the issue before the Circuit, which held that in order for a sale to be "under the United States Patent" such that the patentee's rights are exhausted, the sale must be "in the United States." 264 F.3d at 1105. According to the Court:

**United States patent rights are not exhausted by products of foreign provenance.** To invoke the protection of the [exhaustion by first sale] doctrine, the authorized first sale must have occurred under the United States patent [citing *Boesch* ] ... Our decision applies only to LFFPs for which the United States patent right has been exhausted by first sale *in the United States.*

*Id.* (emphasis added). The Federal Circuit explicitly stated this holding four times in the *Jazz v. ITC* opinion. *See id.* at 1098 (reaching repair issue only with respect to used cameras whose first sale was "in the United States" with the patentee's authorization); *id.* at 1105 (exhaustion applies "when a patented device has been lawfully sold in the United States"); *id.* at 1110 (same, and affirming the ITC's finding of infringement for "LFFPs whose prior sale was not in the United States"). Thus, the Federal Circuit has ruled that Fuji's patent rights are exhausted only with respect to cameras refurbished from shells first sold in the United States. This court is bound by that ruling.[20]

**19.** *Compare Ajinomoto Co., Inc. v. Archer–Daniels–Midland Co.,* 228 F.3d 1338, 1348 (Fed.Cir.2000) (importation into United States of a product made abroad by a patented process is infringement under Product Process Amendments Act, 35 U.S.C. § 271(g), even though product was authorized to be produced outside the United States).

**20.** Jazz sought a stay of the Federal Circuit's ruling, rehearing *en banc,* and certiorari to the Supreme Court on the exhaustion issue. In its various petitions, Jazz argued that the Federal Circuit improperly changed the law and that foreign exhaustion should remain viable if the patented article is sold by the holder of a license in both the United States and the foreign country. Jazz's petitions were denied. The Circuit's decision is therefore *stare decisis* in this case.

Nor is the proposition that foreign sales should not eviscerate United States patent rights without substantial justification. Indeed, it follows directly from the territorial nature of the patent laws themselves. *Cf. Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) (patent laws "do not, and were not intended to, operate beyond the limits of the United States"). As one leading commentator

*"Exhaustion"—The Jury's Verdict.*

In the stipulated Special Verdict form, the jury was asked to determine: (1) the total number of refurbished cameras sold by Jazz Photo and Jazz Hong Kong in or to the United States during the relevant period (Question 1); (2) the number of those cameras refurbished from shells of cameras first sold in the United States (Question 2); and (3) the number of those cameras made from shells of cameras first sold abroad (Question 3).[21] In response to these questions, the jury rendered the following verdict:

| | |
|---|---|
| TOTAL NUMBER OF REFURBISHED CAMERAS: | 40,099,369 |
| TOTAL NUMBER FIRST SOLD IN THE U.S.: | 3,809,442 |
| TOTAL NUMBER FIRST SOLD ABROAD: | 36,289,927 |

Thus, the jurors concluded that approximately 9.5% of the cameras sold by Jazz were refurbished from shells of U.S. origin.[22]

*"Exhaustion"—Application of Law to Fact.*

Applying the jury's verdict to the legal principles discussed above, this Court reaches the following conclusions: (1) Fuji's patent rights have been exhausted with respect to 3,809,442 cameras refur-

bished from shells first sold in the United States; (2) only those 3,809,442 shells could have been permissibly repaired; and (3) Jazz's sales of the remaining 36,289,927 cameras refurbished from foreign-sold shells infringed Fuji's patents.

## III. INTERSECTION BETWEEN "REPAIR" AND "EXHAUSTION"

As the analysis above demonstrates, Jazz has met its burden to prove repair with respect to 4,009,937 shells sold between 1995 and August 21, 2001, constituting 10% of Jazz's total sales of refurbished cameras. Jazz has further proven that, during this same time period, Fuji's patent rights were exhausted by first sale in the United States with respect to 3,809,442 cameras, or 9.5% of the total number of refurbished cameras sold by Jazz.

■ While there has been no direct evidence presented by either party demonstrating that any one camera was both permissibly repaired and refurbished from a domestic shell, the Court believes that it would be fundamentally unjust under the circumstances of this case to require Jazz to adduce direct proof of the country of origin for each and every permissibly re-

---

has noted, "[s]ince a patent only extends to the borders of the country using it, it makes sense to limit the right to make, use or sell the product to the same borders." Martin J. Adelman, PATENT LAW PERSPECTIVES § 3.6[1]. Thus, "anyone purchasing a product in the territory of one sovereign country ought to be on notice that the use or sale of that product in another sovereign country may be impermissible." *Id.* This was precisely the balance struck by the Federal Circuit in *Jazz v. ITC.*

21. Specifically, Question 3 asked the jury to determine the number of cameras sold by Jazz in or to the United States made from refurbished shells of cameras first sold outside the United States by Fuji or a licensee with the right to sell in both countries. This question was asked solely in an abundance of caution: after the appeal of this matter, should the Federal Circuit sitting *en banc* or

the Supreme Court overrule the panel decision in *Jazz v. ITC* on the issue of foreign first sale, a retrial of this matter would be unnecessary.

22. This verdict is amply supported by the record. Fuji's witness, Mr. David Field testified that Fuji's examination of reloaded cameras showed that approximately 86% of the cameras examined came from Japan, that a "very small amount" came from Europe, and that the remainder of cameras came from the United States. Mr. Field's testimony is consistent with the testimony of Mr. Lorenzini, Jazz's former president, who testified that "600,000 out of 7 million, or something like that, 10 percent" of Jazz's shells came from a United States supplier in 1997 (Lorenzini Tr. 10/28/02 at 5.121.6).

paired camera it sold.[23] As the finder of fact charged with determining the number of infringing cameras, the Court concludes that it is reasonable to infer from the evidence adduced at trial (and the jury's finding that 9.5% of the entire pool of the cameras sold by Jazz were of domestic origin) that 9.5% of the 4,009,937 permissibly repaired cameras sold by Jazz were refurbished from shells first sold in the United States.

### Summary and Conclusion—Repair/Reconstruction and Exhaustion.

For the foregoing reasons, this Court concludes that Jazz has satisfactorily proven both exhaustion and repair with respect to 380,944 cameras sold between 1995 and August 21, 2001. The remaining 39,718,425 refurbished cameras sold by Jazz are found to have infringed Fuji's patents. When added to the number of newly-made cameras found by the jury to have been sold by Jazz during the relevant period, for which infringement is not contested, the resulting total number of infringing cameras is 40,928,185.

## IV. DEFENDANTS' RULE 50(B) MOTION.

■ Defendants move for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure on the following four issues: reasonable royalty; lost profits; inducement of infringement; and willful infringement. The standard for a motion for judgment as a matter of law is well-settled in the Third Circuit.[24] A Rule 50(b) motion will be granted only where, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir.2002) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993)). The question "is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube*, 4 F.3d at 1166 (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978)).

### Reasonable Royalty.

■ Jazz challenges the jury's verdict of "reasonable royalty" as unsupported by the evidence. This Court cannot agree.

■ A "reasonable royalty" is the rate that would be agreed upon by the patentee and infringer as the result of a hypothetical negotiation at the outset of the infringement. *See Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir.1995). Given the hypothetical nature of the exercise, any reasonable royalty calculation "necessarily involves an element of approximation and uncertainty." *Interactive Pictures Corp. v. Infinite Pictures*,

---

**23.** The issue of foreign versus domestic exhaustion was first introduced into this case during the legal proceedings after the close of the relevant period. Thus, all of the cameras sold by Jazz at issue in this case had already been acquired, refurbished, and sold before the issue first arose. In the interest of reaching a just and fair resolution at trial, this Court relaxed the parties' Repair/Reconstruction Stipulation in order to permit discovery on the issue of the origin of shells and also granted Jazz's request for a jury instruction explaining the absence of perfect records as to the origin of the shells sold by Jazz.

**24.** The governing standard for a Rule 50 motion is procedural in nature. Accordingly, the law of the Third Circuit provides the rule of decision to be applied by this Court. *See EMI Grp. North Am. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1348 (Fed.Cir.2001) (regional law applies to JMOL motion).

*Inc.*, 274 F.3d 1371, 1385 (Fed.Cir.2001) (citations and internal quotations omitted). Thus, a jury's reasonable royalty verdict will be overturned only if "grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1290 (Fed.Cir.2002).

At trial, both Fuji and Jazz pressed their respective positions regarding the outcome of the hypothetical negotiation giving rise to a "reasonable royalty." Fuji's expert, Mr. Carter, opined that there was no established royalty for Fuji's patents, but rather that each license negotiation had to be considered on a case-by-case basis. Mr. Carter estimated that Jazz's expected profits at the time the hypothetical negotiation would have been approximately $1.09, which, he opined, would represent the upper limit of Jazz's bargaining range. Mr. Carter also placed particular emphasis on Fuji's motivation to charge a relatively high royalty in a hypothetical Jazz negotiation than it was willing to charge other competitors, given the wide variance in the parties' respective cost structures and Fuji's reluctance to facilitate the entry of a low-cost competitor who could potentially drive down profits in the entire industry. Based upon these and other factors, Mr. Carter identified $1.00 as the point at which the parties would reach a "meeting of the minds" in a hypothetical negotiation.

By contrast, Jazz's expert, Dr. Stewart, opined that Fuji would be entitled to no more than 11 cents for each newly-made camera and 7 1/2 cents for each refurbished camera. Dr. Stewart based this opinion principally upon his analysis of extant patent licenses granted by Fuji for disposable cameras to other competitors, including Kodak and Concord, which Dr. Stewart argued tended to prove an established royalty.

The jury, as instructed, considered this conflicting testimony in light of the factors articulated in *Georgia–Pacific v. U.S. Plywood Champion Papers, Inc.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *mod.*, 446 F.2d 295 (2d Cir.1971), and awarded a reasonable royalty of 56 cents—well within the range of royalties presented by the parties. In light of the wide variance between the parties' experts, it was within the jury's realm, as the finder of the facts, to reject "the extreme figures proffered by the litigants as incredible and substitute an intermediate figure as a matter of its judgment from all of the evidence." *Smith-Kline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1168 (Fed.Cir. 1991).[25]

Under the facts presented here, it cannot be said that the jury's 56 cent royalty award is so "grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork" that it must be overturned as a matter of law. *See Catalina Lighting*, 295 F.3d at 1290. Jazz's Rule 50(b) motion with respect to reasonable royalty therefore DENIED.

### Lost Profits.

█ The jury awarded Fuji damages for lost profits with respect to 4% of Jazz's sales. Jazz challenges this verdict on the ground that Fuji failed to prove the ab-

---

**25.** In their post-trial submissions, Defendants imply that the jury was constrained to adopt or reject the reasonable royalty of one or the other party (Def's Omnibus Br. at 27). However, the Federal Circuit's decision in *Smith-Kline Diagnostics*, the principal case upon which Defendants rely, is directly to the contrary. *See* 926 F.2d at 1168 ("the factual determination of a reasonable royalty ... need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party.").

sence of non-infringing alternatives under *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir.1978).

■ A patent holder who has established liability for infringement is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer ..." 35 U.S.C. § 284. A standard method of establishing patent damages is for the patentee to demonstrate "the profits on sales it would have made absent the defendant's infringement." *Panduit*, 575 F.2d at 1156. "Lost profit" damages of this kind, however, must be proved—they are never presumed. *See, e.g., Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed. Cir.1991). If the patent owner cannot demonstrate its entitlement to lost profits, "only a reasonable royalty may be recovered." 8 LIPSCOMB'S WALKER ON PATENTS § 27:24 (1989); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed.Cir.2001).

■ In order to recover lost profits, a patent owner must demonstrate "a causal connection between the infringement and its loss of profits." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed.Cir.1993). In other words, "the burden rests on the patentee to show a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Crystal Semiconductor*, 246 F.3d at 1353. Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's claim] is unreasonable for some or all of the lost sales." *Grain Processing Corp. v. American Maize–Products Co.*, 185 F.3d 1341, 1349 (Fed.Cir.1999).

■ Case law has developed two principal methods for a patentee to meet its burden of establishing "but for" causation. The first method derives from the seminal decision in *Panduit*. In order to obtain lost profits damages under the *Panduit* test, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Id.* at 1156. Upon proof of these four elements, a presumption of "but for" causation is accorded the patent holder with respect to all of the alleged infringer's sales. *See State Industries*, 883 F.2d at 1578; 7 CHISUM ON PATENTS § 20.03[1].

■ A literal application of the *Panduit* test is inappropriate, however, in situations involving multiple competitors, such as in the present case. As an initial matter, the presumption that all of the infringer's sales would have accrued to the patentee absent the infringement is unreasonable in the multi-competitor landscape, where presumably some portion of the infringer's sales would have accrued to competitors other than the patent holder itself. *Cf. State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 1578 (Fed. Cir.1989). Moreover, the presence of multiple competitors makes proof of the second *Panduit* factor—absence of acceptable non-infringing alternatives—impossible, since in the ordinary multi-competitor situation the patentee's competitors by definition engage in the sale of non-infringing alternatives.

Thus, Courts have refined *Panduit* to allow a patentee to substitute proof of the patentee's market share for the second *Panduit* factor. *See, e.g., State Industries*, 883 F.2d at 1578. This second method of proving causation is generally referred to as the "market share" approach.

The dispute between Fuji and Jazz centers around which of these two approaches is most appropriately applied to the facts of this case. Jazz argues that Fuji must demonstrate the second *Panduit* factor, but has failed to do so here because Jazz could have substituted a permissibly repaired camera from a shell first sold in the United States for each infringing camera that it actually sold. Fuji, on the other hand, contends that proof of its own market share, adjusted for price elasticity, is sufficient to satisfy its burden to prove "but for" causation under *State Industries* and its progeny.

Given the unique circumstances of this case, Jazz's argument is persuasive. As the Federal Circuit noted in *Grain Processing*, "a fair and accurate reconstruction of the 'but for' market" requires consideration of the "alternative actions the infringer foreseeably would have undertaken had he not infringed." *Grain Processing*, 185 F.3d at 1350–51. The rationale underlying this rule is simple:

> Without the infringing product, a rational would-be infringer is likely to offer an acceptable non-infringing alternative, if

available, to compete with the patent owner rather than leave the market altogether. **The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner . . . .**

*Id.* at 1351 (emphasis added). In the instant case, Jazz could have sold a non-infringing alternative by permissibly repairing cameras out of shells first sold in the United States. Cameras refurbished in this fashion would have had all of the appearances of the cameras Jazz actually sold. In light of this alternative, it is "hardly likely," in the words of *Grain Processing*, that Jazz would have surrendered its entire share of the disposable camera market. *See id.*[26]

■ Thus, under the circumstances of this case, Fuji's reliance on proof of its own market share, without more, is insufficient as a matter of law to support a reasonable probability of "but for" causation of lost profits.[27] *See, e.g., Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d

---

**26.** At trial, Jazz's damages expert, Dr. Stewart, opined that Fuji's suffered no lost profits, based in large part upon the availability of this non-infringing alternative. Yet Fuji adduced no evidence at trial to demonstrate that it would have captured some or all of Jazz's sales if Jazz had pursued this alternative. Indeed, Fuji's damages expert, Mr. Carter, acknowledged the existence of this alternative on cross-examination, but failed to consider its impact on Fuji's market share analysis. In their post-trial submissions, Defendants challenged Fuji's expert testimony on *Daubert* grounds for failure to consider the impact of this non-infringing alternative. While on its face untimely, Defendants' *Daubert* objection appears to have been preserved by Magistrate Judge Chesler's oral ruling on October 7, 2002. Given the Court's disposition, however, it is unnecessary to address this issue.

**27.** *Grain Processing* and its progeny place the burden of demonstrating the availability of

the non-infringing alternative on the infringer. *See Grain Processing*, 185 F.3d at 1353; *see also Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed.Cir.2002). Fuji argues that Jazz has failed to satisfy this burden because, Fuji contends, the non-infringing alternative—a camera repaired from a U.S. shell—was only a theoretical possibility. To the contrary, this Court's holdings with respect to repair/reconstruction and exhaustion, as well as the jury's advisory verdict, make clear that Defendants could have refurbished cameras in a non-infringing manner. Jazz has therefore proven availability. Thus, it is Fuji's burden, as part of its ultimate burden of proof, to demonstrate a reasonable probability of "but for" causation *in light of* this non-infringing alternative. Proof of Fuji's market share, standing alone, does not satisfy this burden.

1453, 1458 (Fed.Cir.1991) (affirming district court's refusal to award lost profits based on market share theory where patentee failed to establish that alleged infringer would not have made sales in non-infringing manner); *see also Grain Processing,* 185 F.3d at 1351 ("[w]here an infringer demonstrates that it could have chosen to market a non-infringing alternative and that it would have done so had it known that it was infringing ... the sales that it made of the infringing products were not sales that the patentee would otherwise have made") (citing SCHLICHER, PATENT LAW: LEGAL AND ECONOMIC PRINCIPLES § 9.05[2][1] ). Jazz's Rule 50(b) motion with respect to lost profits is therefore GRANTED.[28]

### Willful Infringement.

■ The jury determined that Jazz and Jack Benun willfully infringed Fuji's patents with respect to the 1,209,760 newly-made cameras sold by Jazz during the relevant period, but found no willful infringement with respect to the remaining, refurbished cameras. Jazz seeks judgment as a matter of law with respect to this finding of willfulness for newly-made cameras.

■ Whether infringement is willful is a question of fact for the jury, which the patentee must prove by clear and convincing evidence. *See, e.g., Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.* 249 F.3d 1341, 1355–56

(Fed.Cir.2001). A jury's finding of willfulness may be overturned on a motion for judgment as a matter of law only if unsupported by substantial evidence in the record. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1190 (Fed. Cir.1998). Thus, an infringer seeking to overturn a verdict bears a "heavy burden" to show that "no reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence." *Id.*

■ It is well-settled that, "[w]hen an infringer has actual notice of a patentee's rights, the infringer has an affirmative duty of due care to avoid infringement." *Crystal Semiconductor Corp.,* 246 F.3d at 1351 (citing *Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1566 (Fed. Cir.1988)). Here, there is no dispute here that Defendants had actual knowledge of Fuji's patents dating back to 1995, when Mr. Benun first approached Fuji for a license to sell disposable cameras. Moreover, Mr. Benun testified that Jazz "absolutely" needed a license to sell newly-made cameras. Under these circumstances, Defendants clearly had a duty to exercise due care to refrain from infringing activities.

■ There is no dispute that both Jazz Photo and Jazz Hong Kong in fact sold newly-made cameras. Indeed, Jazz offered no defense to infringement with respect to these cameras at trial.[29] Defendants' argument for judgment as a matter of law on willfulness is based upon the

---

**28.** Given the Court's disposition, it is also unnecessary to address Jazz's alternative contention that its cameras operate in a different market segment than those of Fuji and that, accordingly, the majority of its sales would have gone to competitors other than Fuji. *See BIC Leisure Prods. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214 (Fed.Cir.1993).

**29.** Because infringement with respect to newly-made cameras was effectively conceded at

trial, Jazz offered no opinion of counsel with respect to these cameras. Indeed, no such opinion could exist. While ordinarily the absence of an opinion is of critical significance in any willfulness inquiry, it is of less importance under the circumstances presented here—*i.e.*, where the alleged infringer knew that a particular action would constitute infringement, but claims not to have known that it was taking the action.

testimony of Mr. Benun that Defendants were unaware that the cameras were newly-made until after the fact. Even under Defendants' theory, the willfulness issue turns on whether Mr. Benun's testimony was truthful. Credibility issues of this kind are squarely within the province of the jury. The jury in this case could well have determined that Mr. Benun's self-serving protestations as to Defendants' lack of knowledge were entitled to little, if any, weight.

 Defendants' motion for judgment as a matter of law with respect to willfulness is DENIED.[30]

### Inducement.

 Finally, Mr. Benun challenges the jury's verdict finding him personally liable for inducing the infringement of Jazz Photo.

 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

This section of the patent statute "is premised on a concept of tortfeasance whereby persons in authority and control may in appropriate circumstances be deemed liable for wrongdoing when inducing direct infringement by another." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed.Cir.1996). Before inducement liability will attach, the patentee must satisfy the following two-part test: first, the patentee must show that there has been direct infringement; and second, the patentee must prove that the alleged infringer knowingly induced the direct infringement and possessed a specific intent to encourage that infringement. *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed.Cir. 2002) (citations omitted).

The first requirement has clearly been met here: Both this Court and the jury have found that Jazz Hong Kong and Jazz Photo directly infringed Fuji's patents.

Mr. Benun's Rule 50(b) motion is directed principally to the second requirement.

---

**30.** While the jury's finding of willfulness with respect to the newly-made cameras remains undisturbed, the Court declines to exercise its discretion to award enhanced damages and attorneys' fees under the circumstances of this case. *See* 35 U.S.C. § 284 (trial court may "increase the damages up to three times the amount found or assessed") and § 285 (trial court may award attorney fees "in exceptional cases"). It is well-settled that "a finding of willful infringement merely authorizes, but does not mandate an award of increased damages." *See Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed.Cir. 1990); *see also Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1313 (Fed.Cir. 2002). The paramount consideration in determining whether to award enhanced damages is "the egregiousness of the defendant's conduct based on all the facts and circumstances." *Riles*, 298 F.3d at 1313.

The Court concludes, in its discretion, that enhanced damages and/or fees are not warranted here for the following reasons: (1) Jazz did not manufacture the new cameras—

it acquired them from third parties; (2) the newly-made cameras reflected a very small percentage (roughly 3%) of the total cameras sold by Jazz; (3) Fuji adduced no direct evidence at trial that any Defendant had actual knowledge that any supplier was providing Jazz with cameras refurbished from newly-made shells, but rather relied upon an inference arising out of the fact that the cameras were sold and the credibility of Mr. Benun; (4) Mr. Benun testified that Jazz took remedial measures once, according to Mr. Benun, the infringement was discovered; (5) Fuji adduced no evidence at trial that the sale of newly-made cameras resumed or continued thereafter with any Defendant's knowledge; (6) this Court is not aware of any efforts on behalf of Defendants to conceal the existence of Jazz's sales of newly-made cameras; and (7) there is nothing with respect to Defendants' conduct in the instant litigation which would warrant any damages enhancement. Under these circumstances, the Court feels that an award of enhanced damages and/or fees would be inappropriate in this case.

He contends that Fuji failed to adduce sufficient evidence that he acted with the requisite degree of intent to actively induce Jazz's infringement.

 While proof of the alleged inducer's intent is a necessary element of the patent holder's burden to prove inducement, it is well-settled that "direct evidence [of intent] is not required; rather, circumstantial evidence may suffice." *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363, 2003 WL 124307, at *12 (Fed.Cir. Jan.16, 2003). Indeed, as this Court has noted, in certain cases, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence" of intent. *See Symbol Techs., Inc. v. Metrologic Instrum., Inc.*, 771 F.Supp. 1390, 1405 (D.N.J.1991) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed.Cir.1986)); *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988). Moreover, "[i]ntent is a factual determination particularly within the province of the trier of fact." *Water Technologies*, 850 F.2d at 669 (quoting *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988)).

At trial, Fuji offered substantial circumstantial evidence of Mr. Benun's intent to induce Jazz's infringement of Fuji's patents. Fuji demonstrated Mr. Benun's control over Jazz throughout the period at issue and his personal direction of Jazz's infringement. After having left Concord in 1994, Mr. Benun founded Jazz. He was Jazz's President, Chief Executive Officer, and sole director. His wife and children owned all of Jazz's stock. In 1995, under Mr. Benun's direction, Jazz began selling refurbished cameras without having requested a license from Fuji to do so and without having obtained any non-infringement opinion of counsel. It was only after Jazz began selling cameras that Mr. Benun twice approached Fuji to request a license. No such license was forthcoming, yet the infringing sales continued—again, with no opinion of counsel.

Mr. Benun resigned his positions as director and officer of Jazz in April 1997, at which time he assumed the position of "consultant." However, Fuji adduced evidence demonstrating that Mr. Benun's resignation was not a relinquishment of control over the company at all. Rather, it was designed to facilitate the public offering of Jazz stock, as Mr. Benun had previously been barred from serving as a director and officer of any public company.[31]

After becoming a "consultant," Mr. Benun continued to exert substantial control over Jazz. Mr. Benun remained intimately involved in virtually all aspects of Jazz's business. He hand-picked his own successor, Mr. Lorenzini.[32] Mr. Benun's family continued to own the overwhelming majority of Jazz stock under a voting agreement, pursuant to which they agreed to grant him an irrevocable proxy to vote their shares in the event the bar preventing him from serving as an officer or director of the company was ever lifted.

Perhaps most probative of Mr. Benun's control, during the post–1997 time period when Mr. Benun was a purported "consultant" to Jazz, the company paid him over $10 million in direct payments and loans,

---

**31.** This public offering was ultimately never consummated because the national stock exchanges to which Jazz applied all refused to list the company.

**32.** Mr. Lorenzini's compensation package included a $5,000 per month housing allowance, which he used to move into the house next door to Mr. Benun, which was held in the name of one of Mr. Benun's daughters. Mr. Lorenzini's obligation to pay rent on this house was eventually waived.

representing more than four times the company's retained earnings during that time period.

This evidence tends to prove that Mr. Benun was *the* moving force behind Jazz's infringement of Fuji's patents. Numerous courts have affirmed a finding of inducement on a far lesser showing than was made by Fuji here. *See, e.g., Sensonics, Inc.,* 81 F.3d at 1575–76 (affirming finding of inducement where district court disbelieved statement of founder that he lacked control to discontinue production of infringing products after he became aware of patentee's rights); *Power Lift, Inc. v. Lang Tools, Inc.,* 774 F.2d 478, 481 (Fed. Cir.1985) (affirming denial of Rule 50 motion brought by "president, founder, majority owner and director" of infringing company). Indeed, "[t]he cases are legion holding corporate officers and directors personally liable for participating in, inducing, and approving acts of patent infringement by a corporation." *Fromson v. Citiplate, Inc.,* 886 F.2d 1300, 1304 (Fed.Cir. 1989).

The jury in this case had more than ample evidence from which to infer that Mr. Benun induced Jazz to infringe Fuji's patents, and possessed the specific intent to do so. Viewing the evidence in a light most favorable to Fuji, as this Court must, Mr. Benun has offered no basis to disturb the jury's verdict. Mr. Benun's Rule 50(b) motion is therefore DENIED.

### CONCLUSION

For the reasons stated in this Opinion, this Court finds that Jazz is liable for infringement of Fuji's patents with respect to 40,928,185 cameras sold by Jazz during the period 1995 through August 21, 2001. Multiplying this number by the jury's reasonable royalty award of 56 cents per infringing camera, this Court finds that Fuji was damaged by Jazz's infringing sales in the amount of $22,919,783.60. Mr. Benun is liable for inducement of infringement with respect to 39,103,664 cameras. An appropriate Final Order and Judgment will issue forthwith.

### ORDER AND JUDGMENT

This patent infringement action having been commenced on June 23, 1999 by the filing of a Summons and Complaint by Plaintiff Fuji Photo Film Co., Ltd. ("Fuji") against Defendants Jazz Photo Corp. ("Jazz Photo"), Jazz Photo (Hong Kong) Ltd. ("Jazz Hong Kong") and Jack Benun; and a trial on the merits having been held beginning on October 24, 2002 and the jury having rendered a unanimous verdict on December 2, 2002; and for the reasons stated in this Court's Opinion dated as of this date;

**IT IS** on this 25th day of February, 2002, hereby **ORDERED** that Jazz Photo and Jazz Hong Kong's importation, use, and/or sale of 40,928,185 Lens Fitted Film Packages ("LFFP's") from the period 1995 through August 21, 2001 infringed Fuji's patent rights in violation of 35 U.S.C. § 271(a); and it is further

**ORDERED** that Defendant Jack Benun induced Jazz Photo's infringement with respect to 39,103,664 cameras in violation of 35 U.S.C. § 271(b); and it is further

**ORDERED** that all Defendants' infringement was willful with respect to 1,209,760 newly-made LFFP's imported, used, and/or sold by Jazz during the period 1995 through August 21, 2001; and it is further

**ORDERED** that Fuji was damaged as a result of the Defendants' infringement in the total amount of $22,919,783.60, representing the number of infringing LFFP cameras multiplied by a reasonable royalty of $0.56 per camera; and it is further

**ORDERED** that judgment is hereby **GRANTED** in favor of Plaintiff against

Defendants Jazz Photo, Jazz Hong Kong and Jack Benun, jointly and severally, in the amount of $21,898,051.84; and it is further

**ORDERED** that, judgment is hereby **GRANTED** in favor of Plaintiff against Defendants Jazz Photo and Jazz Hong Kong, jointly and severally, for the additional amount of $1,021,731.76; and it is further

**ORDERED** that Defendants will pay pre-judgment interest at the statutory rate provided for in N.J. ·Ct. R. 4:42–11, compounded annually; and it is further

**ORDERED** that the parties will jointly submit an accounting of the appropriate calculation of pre-judgment interest, with a proposed form of order, within ten business days of the entry of this Order and Judgment; and it is further

**ORDERED** that all other pending motions in the above-captioned matter are **DISMISSED** as moot.

## ADDENDUM
## SPECIAL VERDICT FORM

### Special Verdict Form
Fuji v. Jazz Photo et al.,
Civil Case No. 99-2937 (FSH)

This case will be decided on the basis of the answers that you give to certain questions that will be submitted to you. Each of the questions calls for insertion of a finding (for example a number, dollar amount or period of time) or a "Yes" or "No" answer. The answer to all questions must be based on a unanimous decision of all of you. When all of you have agreed on any answer, the foreperson of the jury will write the answer in the space provided for each answer. As you will note from the wording of the questions, depending on how you answer certain questions, you may not have to answer others.

When you have answered all the questions which require answers, report to the Court.

Do not assume from the questions or from the wording of the questions or from my instructions on them what the answers should be.

WE THE JURY, make the following unanimous answers to the following questions submitted by this Court.

1. How many refurbished one-time use cameras did Jazz Photo and Jazz Hong Kong sell in or to the United States between 1995 and August 21, 2001?

2. Of the number of refurbished cameras Jazz Photo and Jazz Hong Kong sold in or to the United States (which you wrote in answer 1), how many were refurbished from shells of cameras first sold IN the United States?

3. Of the number of refurbished cameras Jazz Photo and Jazz Hong Kong sold in or to the United States (which you wrote in answer 1), how many were refurbished from shells of cameras first sold outside the United States by Fuji, or a licensee who had the right to sell both in the country where it was first sold, and in the United States.

4. How many NEWLY MADE (not refurbished) cameras did Jazz Photo and Jazz Hong Kong sell in or to the United States?

5. Which of the following happens at least some of the time when the cameras sold by Jazz are refurbished: (write "yes," "no," or "unknown" in the space):

**Write Yes, No, or Unknown**

(a) Removing the cardboard cover. _____

(b) Cutting open the plastic casing. _____

(c) Inserting new film and a container to receive the film. _____

(d) Replacing the winding wheel for certain cameras. _____

(e) Replacing the battery for flash cameras. _____

(f) Resetting the counter. _____

(g) Resealing the outer case. _____

(h) Adding a new cardboard cover. _____

(i) Removing the front cover. _____

(j) Replacing the front cover from one camera on a different camera. _____

(k) Slim tool step. _____

($l$) Unwinding the film from the cartridge in the camera. _____

(m) Multiple hook attachments and later removals. _____

(n) Modifying the film cartridge to mesh with winding wheel _____

(o) Inserting, then removing a film spindle. _____

(p) Replacing the film door. _____

(q) Cutting plastic tabs to open the camera _____

(r) Inserting a washer to hold open attached rear cover. _____

(s) Grinding off the Fuji logo. _____

6A. How many refurbished cameras sold in or into the United States by Jazz Photo and Jazz Hong Kong (which you wrote in answer to question 1 and without regard to where the cameras had been first sold, as you addressed in answer to questions 2 and 3) were permissibly repaired? Write a number of cameras: _____.
If the number of cameras you wrote in answer to Question 6A is less than the number of cameras you wrote in answer to Question 1, then the number of infringing refurbished cameras is the number from Question 1 MINUS the number from Question 6.

_____ - _____ = _____

(Write Number From (Write Number From (Subtract And Fill In Number.
 Question 1) Question 6) This is the number of cameras
 not permissibly repaired, which
 you will use in question 8.)

6B. Of the number of refurbished cameras which you wrote in answer to question 2, how many refurbished cameras sold in or into the United States by Jazz Photo and Jazz Hong Kong were permissibly repaired? Write a number of cameras:

7. Did Jack Benun induce Jazz Photo or Jazz Hong Kong to infringe any of Fuji's patents?

Circle "Yes" or "No"

(a) Induced Jazz Photo. Yes No

(b) If yes to (a), over what time period (if no, skip this question)? _____, and for how many cameras (write a number): _____

## Circle "Yes" or "No"

(c) Induced Jazz Hong Kong. Yes No

(d) If yes to (c), over what time period (if no, skip this question)? _____, and for how many cameras (write a number): _____

8. You have been asked to decide how many refurbished cameras sold by Jazz were permissibly repaired. (This is the result of the equation at the end of Question 6A) Even if you find that all of the cameras were permissibly repaired, answer the rest of the questions so the Court can determine how much to award in damages if the Court disagrees with your finding. What TOTAL profit would Fuji have made but for Jazz sales of the refurbished cameras which were NOT permissibly repaired? $_____. Continue to question 9.

9. What amount of profit did Fuji make on each individual camera it sold? Write an amount of money here: $_____.

10. If you find that Jazz's sales of NEWLY MADE (not refurbished) cameras took sales away from Fuji, answer this question; otherwise skip to question 11. What profit would Fuji have made but for Jazz sales of NEWLY MADE (not refurbished) cameras? $_____

11. What amount of money is a reasonable royalty for Jazz Photo and Jazz Hong Kong to pay Fuji for each infringing camera sold? $_____

12. For each defendant for which you find infringement, state whether infringement was willful (circle "Willful" or "Not Willful"):

Circle ONE for each defendant

(a) Jazz Photo New Cameras: Willful Not Willful

(b) Jazz Hong Kong New Cameras: Willful Not Willful

(c) Jazz Photo Refurbished Cameras: Willful Not Willful

(d) Jazz Hong Kong Refurbished Cameras: Willful Not Willful

13. For defendant Jack Benun, if you find he induced infringement answer this question; otherwise, skip this question. State whether such inducement was willful (circle "Willful" or "Not Willful"):

Circle ONE

Jack Benun New Cameras: Willful Not Willful

Jack Benun Refurbished Cameras: Willful Not Willful

Sign and date this verdict sheet and notify the courtroom deputy.

Dated: November ____, 2002

By:_____
 Foreperson